L & B PIPE & SUPPLY COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
L & B Pipe & Supply Co. v. Commissioner
Docket No. 10329-91
United States Tax Court
T.C. Memo 1994-187; 1994 Tax Ct. Memo LEXIS 190; 67 T.C.M. (CCH) 2798; April 28, 1994, Filed *190 Decision will be entered for petitioner. For petitioner: Robert A. Levinson, Aaron W. Zimmer, and Bruce Givner. For respondent: Patrick W. Lucas. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal corporate income taxes: FY Year
Additions to Tax
Ended
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(1)(A)
Sec. 6653 (a)(1)(B)
4/30/87
$ 445,862
-- $ 22,293
[1]
4/30/88
284,292
-- 14,214
[2]
4/30/89
303,242
$ 15,162
-- -- The issues for decision are: (1) Whether salary and bonus amounts paid to petitioner's two shareholders in its fiscal years ending 1987-89 are deductible by petitioner as reasonable compensation under section 162(a)(1). We hold that they are. (2) Whether petitioner is liable for additions to taxes under sections 6653(a)(1) and 6653(a)(1)(A) and (B) during the years in issue. We hold that it is not. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax *191 Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner is a California corporation whose principal place of business was in Torrance, California, at the time the petition was filed. Petitioner is a durable goods wholesaler of hardware, plumbing, and heating equipment supplies. The "L & B" in petitioner's name are the initials of its owners' names, Galen "Lynn" Craig (Craig) and Robert "Bob" Grosher (Grosher), who began the company in 1977. Grosher was petitioner's president and treasurer during the years in issue. Craig was petitioner's vice president and secretary during the same period. Grosher and Craig were petitioner's only officers and shareholders. Grosher and Craig met and became friends in high school. Upon graduating from high school, they served in the military, and in the 1970s they went to work for Todd Pipe and Supply Co. (Todd Pipe), one of the larger wholesale plumbing businesses in Los Angeles. Grosher and Craig started out as truck drivers and were promoted quickly to middle management. Craig took classes to learn to design irrigation systems *192 and how to better run Todd Pipe's turf and irrigation department. Consequently, Craig was responsible for increasing his department's annual sales from $ 200,000 to $ 1.4 million within a few years. At Todd Pipe, Grosher and Craig noticed that the needs of smaller contractors and landscapers were being overlooked by the big wholesale companies. Grosher and Craig determined that those smaller customers provided the largest gross profit margins. Armed with several years' experience in the wholesale plumbing business and encouraged by their successes within their respective departments, Grosher and Craig left Todd Pipe in early 1977 to start their own plumbing supply company. Their goal was to tap the unexplored market segment of small plumbing and landscaping contractors by creating a company designed to cater to those customers' needs. Grosher and Craig sold their homes to raise petitioner's initial capitalization of $ 15,000. They were given a line of credit based on their personal guarantees and their well-prepared loan application package that included a projected sales analysis and inventory. Based on their reputations and relationships developed with plumbing supply vendors *193 while at Todd Pipe, they were able to set up open accounts with many vendors and guaranteed loans for supplies from others. Grosher and Craig spent months deciding upon the proper location for their business, considering such factors as proximity of prospective customers, competitors and suppliers, and highway access. They finally decided to lease a former carbon factory in Torrance, California. Grosher and Craig personally rehabilitated the dilapidated building. Together they purchased, assembled, and repaired all of petitioner's original equipment. They slept in the warehouse at night for 2 months to safeguard petitioner's inventory. With an employee base including Grosher, Craig, and two drivers, petitioner opened for business in August 1977. In petitioner's early years, Grosher's and Craig's duties were the "hands on" operation of the business itself; i.e., making sales calls, purchasing inventory, collecting accounts, and loading materials onto trucks. Petitioner was open every day for business at 6:00 a.m., including Saturdays. Grosher and Craig worked long hours, 6 days a week, and half-days on Sundays. Their typical work day started with writing purchase orders at *194 4:00 a.m., and they often worked until midnight filling out invoices before they computerized petitioner's operations. Petitioner had approximately 68 competitors in Los Angeles County during the years in issue. Because their emphasis was on supplying and catering to the needs of the small customers, many of whom dropped by to pick up parts, Grosher and Craig installed a 50-foot "will-call" counter to accommodate a large number of customers at a time. Whenever there was a line at the will-call counter, Grosher and Craig made sure "all hands were on deck", including themselves, to help customers at the counter. As evidence of their commitment to their customers, Grosher and Craig made it a policy to deliver any part, even a one-half inch elbow costing 50 cents, to any customer, anywhere, and on time, without a delivery charge. To this end, Grosher and Craig made sure that petitioner had twice as many delivery trucks as its competitors during the years in issue. Grosher and Craig installed radios in their delivery trucks so that they could immediately communicate special instructions and rush orders. Furthermore, unlike any of its competitors, petitioner made deliveries on Saturdays. *195 It was Grosher and Craig's policy not to charge restocking fees and to replace promptly any defective product. For this kind of service, they were able to both build goodwill and charge a premium. Having become buried under paperwork as petitioner's business grew, Grosher and Craig personally researched and purchased a computer system for $ 120,000 in 1978, at a time when only two of petitioner's competitors used computers. Grosher and Craig were thus able to computerize petitioner's invoicing, recordkeeping, and inventory control. They continually upgraded the system at costs exceeding $ 60,000. Due to its profitability, petitioner was able to afford the investment a year after opening without financing. Grosher and Craig used the computer to develop a sophisticated pricing matrix to price petitioner's products for each customer in a manner that achieved maximum gross profit margins. Grosher and Craig personally reviewed each customer's application for credit and determined a pricing code based on that customer's product needs. Grosher and Craig maintained their gross profit margin at 30 percent. Grosher and Craig took innovative measures in managing petitioner's accounts *196 receivable. For example, they allowed customers to pay by credit card, which was not a common practice in the wholesaling business. Grosher and Craig guaranteed loans from their bank to certain customers having trouble paying their bills to petitioner. They also permitted delinquent customers to pay 20 percent (rather than 100 percent) of their past due amounts with each new order for which cash was paid. During the years in issue, petitioner's bad debt ratio was less than one-half of 1 percent, when the industry average was 2 percent. Craig designed petitioner's new facility when it outgrew its original space in 1982. Grosher and Craig financed and owned individually the new facility. Petitioner paid Grosher and Craig 37 cents per square foot as rent for the new facility for which Grosher and Craig each received $ 96,000 per year during the years in issue. Grosher and Craig also rented a small part of the space to another business for 26 cents per square foot during the same period. During a recession in 1983, Grosher and Craig increased petitioner's inventory and stayed committed to service. As a result of this action, they were able to increase petitioner's customer base *197 40 percent during that period. In 1988, after a period of growth in the construction business, Grosher and Craig decided to limit petitioner's growth by not expanding its customer base. They refocused petitioner's concentration on catering to the needs of its current customers such that, although petitioner's rate of growth decreased, its gross profit was larger than ever. During the years in issue, Grosher and Craig performed all of petitioner's executive and managerial functions, sharing in them equally and each working approximately 65-70 hours per week. Together they handled all of the paperwork of the business, typically reviewing more than 7,000 pages of invoices and sales orders monthly, and signing approximately 300 disbursement checks monthly. They personally negotiated inventory prices and terms with each and every vendor, seeing to it that petitioner never missed a manufacturer's discount on its accounts payable. Grosher and Craig personally hired and trained all of petitioner's employees except drivers and unskilled laborers. They positioned their desks in the same office as everyone else in the company, so that they knew everything going on in the business, including *198 observing how their employees handled vendors and customers. Similarly, petitioner's employees could observe how Grosher and Craig handled the business and thereby learn by example. During the years in issue, petitioner employed 28-36 people. It was Grosher and Craig's philosophy to compensate petitioner's employees at the top salary ranges of their industry, and consequently petitioner's employee turnover was very low. The highest level employee under Grosher and Craig was Mike Williams (Williams), who worked as petitioner's general sales manager. Williams primarily dealt with inside sales, price quotations, upkeep of the premises and equipment, and minor employee matters. During the years in issue, petitioner paid its employees salaries and bonuses. Williams received an annual salary during the years in issue that ranged from $ 42,000 to $ 47,000 and bonuses of $ 10,000 to $ 23,000. Petitioner's financial statements reflect the following: Gross
Gross
Net
Retained
FYE
Revenue
Profit
Income
Earnings
1978
$   800,644
144,870
1,751 1,751
1979
2,538,418
583,836
64,935 66,704
1980
4,059,872
1,136,765
219,267 285,971
1981
4,471,906
1,207,415
42,838 328,809
1982
4,769,914
1,430,974
43,852 373,661
1983
4,437,759
1,331,326
(186)
372,475
1984
6,055,011
1,810,606
76,129 448,605
1985
7,223,185
2,163,138
91,717 540,322
1986
7,877,889
2,366,393
74,950 615,272
1987
9,710,470
2,945,829
69,022 684,294
1988
11,776,855
3,493,444
68,194 752,488
1989
11,901,123
3,614,758
51,379 803,867
*199 Petitioner has never paid any dividends. Grosher and Craig financed petitioner's growth with its profits. Grosher and Craig used petitioner's certified public accountant (C.P.A.), Dan Fiorito (Fiorito), as a financial adviser and sounding board for determining their levels of compensation and bonuses at each fiscal yearend. Petitioner's C.P.A. since 1983, Fiorito also serviced nine other clients in the wholesale plumbing industry during the years in issue. While maintaining his other clients' confidentiality, Fiorito was able to provide Grosher and Craig with information about some of petitioner's competitors' performance and compensation levels. Based on information from other clients, Fiorito concluded that petitioner's performance during the years in issue exceeded its competitors. Fiorito observed that his other clients' gross profit percentages ranged between 18 to almost 25 percent, while petitioner's gross profit percentage was approximately 30 percent during the years in issue. Grosher and Craig decided their compensation based on a number of considerations, including petitioner's profits each year. With Fiorito's input, they determined that petitioner had out-performed *200 its competitors year after year in terms of maintaining its gross profit margins. Grosher and Craig therefore concluded that they deserved their admittedly high compensation during the years in issue. Because they had equal responsibilities and put in the same amount of time, Grosher and Craig received exactly the same salaries and exactly the same bonuses since petitioner's inception. The total salaries and bonuses paid to Grosher and Craig by petitioner were as follows: Total
Disallowed by
Allowed by
FYE
Salary
Bonus
Compensation
Respondent
Respondent
1978
$ 65,000
0
65,000
1979
200,000
0
200,000
1980
244,000
0
244,000
1981
541,541
0
541,541
1982
519,748
0
519,748
1983
546,000
0
546,000
1984
236,000
601,000
837,000
1985
416,000
598,000
1,014,000
1986
420,000
615,000
1,035,000
1987
416,000
844,000
1,260,000
964,011
295,989
1988
424,000
840,000
1,264,000
763,504
500,496
1989
500,000
820,000
1,320,000
861,871
458,129
As a percentage of gross profit, total compensation paid by petitioner to its stockholder-officers for each of the years 1978 through 1989 was 44 percent, 34 percent, 21 percent, 45 percent, 36 percent, 41 percent, *201 46 percent, 47 percent, 44 percent, 43 percent, 36 percent, and 36.5 percent. By statutory notice of deficiency, respondent disallowed the payments made to Grosher and Craig as set forth above, determining those amounts deducted as compensation to be unreasonable. During the years in issue, the compensation paid to Grosher and Craig was reasonable for the services performed. OPINION Section 162(a)(1) allows a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as a business expense. To come within the ambit of section 162(a)(1), the compensation must be both reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs. Although framed as a two-prong test, the inquiry under section 162(a)(1) has generally turned on whether the amounts of the purported compensation payments were reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. What constitutes reasonable compensation to a corporate officer is a question of fact to be determined on the basis *202 of all the facts and circumstances of a case. Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7. Petitioner has the burden of proving that the payments to Grosher and Craig were reasonable. Rule 142(a). Many factors are relevant in determining the reasonableness of compensation, and no single factor is decisive. Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court dated Nov. 16, 1948. Definition of the appropriate factors in this case is reviewable by the Court of Appeals for the Ninth Circuit as a question of law. Elliotts, Inc. v. Commissioner, supra at 1245. The Court of Appeals for the Ninth Circuit has divided the factors relevant to the reasonable compensation determination into the following five broad categories for analytical purposes. Roles in Company
The first category of factors identified by the Court of Appeals for the Ninth Circuit concerns the employees' roles in the company. Relevant considerations include Grosher and *203 Craig's qualifications, hours worked, duties performed, as well as their general importance to petitioner's success. American Foundry v. Commissioner, 536 F.2d 289, 292-292 (9th Cir. 1976). In this case we consider closely the nature and scope of Grosher and Craig's duties. They were both highly motivated, uniquely skilled, and extremely productive people. Together they handled all of petitioner's executive and managerial duties. Because of their dedication and thoroughness, working 65 to 70-hour work weeks during the years in issue, petitioner needed no other managers or executives, other than Williams. Under Grosher and Craig's direction, petitioner's gross sales, gross profit margins, retained earnings, and customer base grew steadily throughout its years in operation, including during a recession, and through the years in issue. The record amply demonstrates that petitioner's growth and success were due primarily to Grosher and Craig's extraordinary efforts. External Comparison
The second category of relevant factors is a comparison of the employees' salaries with those paid by similar companies for similar services. Sec. 1.162-7(b)(3), *204 Income Tax Regs. Industry standards are important in determining whether compensation is reasonable. At trial both parties presented expert testimony as to what a like enterprise would pay for like services. Respondent's expert focused on the fact that no company of comparable size paid compensation amounts in the range of petitioner. Petitioner's experts noted that superior performers in petitioner's industry earned more compensation than average performers in larger companies. Respondent argued that petitioner's performance was not so superior as to justify such high compensation. Respondent's expert, Emmet James Brennan, III (Brennan), is the president of a compensation consulting firm. His primary responsibility is to research and establish pay rates for employees and executive compensation levels. According to surveys of financial statements of wholesalers of various categories (general merchandise, building materials, air conditioning, heating and refrigeration equipment and supplies, and industrial supplies) reviewed by Brennan, the average gross profit percentages ranged between 25 and 35 percent, putting petitioner's 30 percent gross profit percentage in the average *205 range during the years in issue. Based on his review and analysis of the highest amounts paid for like services at organizations with sales comparable to petitioner's during the years in issue, Brennan determined the following maximum reasonable compensation amounts, including base salary, bonuses and other cash incentives: 1987
1988
1989
Chief Executive Officer
$ 237,470
283,770
307,710
Chief Financial Officer
189,520
245,120
293,170
426,990
528,890
600,880
In arriving at these numbers, Brennan considered data from organizations representing industry categories including wholesale trade and nonmanufacturing businesses, and public, as well as closely held companies. The data was not industry-specific, and in fact appeared not to include any wholesale plumbing companies. While pointing out that Brennan's figures represent the maximum reasonable compensation levels for a company of petitioner's size, respondent appears to stand by the reasonableness of her own determinations as set forth in her statutory notice, to wit, $ 295,989, $ 500,496, and $ 458,129, for 1987-89. Respondent has not attempted to explain the rationale behind nor the considerable *206 fluctuation in her figures. In particular, we note that the amount of compensation allowed for 1988 is more than that allowed for 1989, while all of petitioner's performance figures clearly increased from 1988 to 1989. Petitioner rebutted respondent's expert's findings with the testimony and conclusions of several witnesses. James W. Kemp (Kemp), shareholder, vice president and chief financial officer of four of Todd Pipe's subsidiaries, and a direct competitor of petitioner's during the year in issue, testified that his compensation was substantially higher than the amounts paid to either Grosher or Craig during the years 1988-90. According to Kemp, the president of the Todd Pipe subsidiaries earned slightly in excess of the amount paid to Kemp. Todd Pipe did a larger volume of business than petitioner in terms of gross sales. Petitioner's expert Edwin A. Scott, Jr. (Scott), is a plumbing industry management consultant. During the years in issue, Scott owned The Wholesaler Magazine, a trade paper for wholesale distribution companies in the plumbing, piping, and heating industry, and lectured frequently on the subject of wholesale plumbing industry executive compensation. *207 The Wholesaler Magazine targeted plumbing supply executives and annually conducted an executive compensation survey. In Scott's opinion, Los Angeles was the second toughest market in which to compete in the country during the years in issue. Scott opined that the compensation paid to Grosher and Craig during the years in issue was reasonable based on the outstanding, unprecedented performance of petitioner in all aspects of its operations. Scott gauged petitioner's ability to generate gross profit dollars, to maximize employee efficiency, and to turn over inventory, and its credit and collection performance. Scott measured petitioner's employee efficiency by examining its annual sales dollars earned per employee. The wholesale plumbing industry average was $ 203,000 to $ 267,000 per employee per year, while petitioner's sales per employee ranged from $ 360,000 to $ 397,000 during the years in issue. In his 40 years of experience in the industry, Scott was unaware of any other companies achieving this level of performance. Sales growth provides a measure of a company's ability to enlarge upon a satisfied customer base, thus reflecting effective market penetration. Petitioner's *208 sales growth of 5 and 10 percent for 1987 and 1988 respectively, was 20 percent above the industry average. Petitioner's reduced rate of growth in 1989 showed Grosher and Craig's uncanny prescience in predicting California's 1989 recession, in Scott's opinion. The faster a company can turn over its inventory the more it uses its capital to grow, which is another indicator of management expertise and efficiency. Petitioner turned its inventory between 8 and 10 times per year during the years in issue, while the industry norm was around 4 turns per year. In this area too, Scott was not aware of any other comparably sized company achieving petitioner's levels of inventory turnover. In terms of gross profit per employee, petitioner ranged from 85 to 125 percent above the industry norm. These high profits per employee reflected petitioner's superior performance in generating dollars of gross profit with far fewer man hours of work than the typical company, according to Scott. Here again petitioner's performance was unique in Scott's experience. Furthermore, no other company was able to maintain its gross profit margin at 30 percent during California's 1989 recession. In Scott's *209 opinion, in addition to being petitioner's co-presidents, effectively, Grosher and Craig also did the work of five additional positions: chief financial officer (CFO), and sales, credit, purchasing, and warehouse managers. It would be entirely appropriate, therefore, for Grosher and Craig's compensation to reflect the combined salaries of the job positions they performed. For example, if they were each performing the work of three people, the relevant comparison would be the combined salaries of those three people at another company. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1246 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. According to data reviewed by Scott, the total compensation paid to an average wholesale plumbing company's two co-presidents, CFO, and managers of sales, credit, purchasing and warehouse, ranged between $ 994,000 to $ 1.57 million during the years 1987-89. Because petitioner's performance placed it in the highest performance category, Scott reasons, the compensation paid to Grosher and Craig during the years was reasonable even if it exceeded the high compensation reported *210 in the surveys. Survey data does not always reflect the highest compensation paid because the highest paid executives are the least likely to disclose their compensation amounts. It was Scott's personal knowledge, however, that the compensation paid to Grosher and Craig did not exceed other high-performing executives in the wholesale plumbing industry. Petitioner had the most outstanding performance in terms of all the basic criteria of managing a wholesale business that Scott has ever encountered in his 40-year career. Petitioner also presented the testimony of Stephen H. Olson (Olson), president of Consilium, Inc., a consultant and valuation expert. In Olson's opinion, the compensation paid to Grosher and Craig during the years in issue was reasonable. We attach a great deal of weight to the expert testimony of Scott because of his knowledge of and experience with executive compensation in petitioner's specific industry. See Griswold Rubber Co., Inc. v. Commissioner, T.C. Memo. 1965-33 (citing Roth Office Equipment Co. v. Gallagher, 172 F.2d 452 (6th Cir. 1949)). We are persuaded by petitioner's experts' testimony *211 and by petitioner's C.P.A., Fiorito, that petitioner's performance was outstanding in comparison to its industry competitors during the years in issue, and that the compensation paid to Grosher and Craig was within an appropriate range for high-performing executives in petitioner's industry. Character and Condition of Company
The third category of factors identified by the Court of Appeals for the Ninth Circuit concerns the character and condition of the company. We focus on the company's size as indicated by its sales, net income, or capital value, and the complexities of the business and general economic conditions. Elliotts, Inc. v. Commissioner, supra at 1246. Petitioner has proved to our satisfaction that during the years in issue, it was a highly specialized company that succeeded in a highly competitive industry. As mentioned above, its gross revenues and gross profit margins indicate its prosperity even during a recession. There is no question that the remarkable growth and profitability of petitioner can be traced directly to the efforts of Grosher and Craig. Conflict of Interest
The primary issue in considering factors *212 indicating a conflict of interest is whether some relationship exists between the company and the employees which might permit the former to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). "Such a potentially exploitable relationship may exist where, as in this case, the * * *[employees are] the taxpaying company's sole or controlling shareholder[s]". Elliotts, Inc. v. Commissioner, supra at 1246. The relationship in this case, where Grosher and Craig were petitioner's sole shareholders, warrants scrutiny. Id. The mere existence of such a relationship, coupled with an absence of dividend payments, however, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high. Id. They are relevant factors but are not to be viewed in isolation. Id. at 1247. Furthermore, we will not presume a disguised dividend from the bare fact that a profitable corporation does not pay dividends. Id. at 1244; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987), *213 affg. T.C. Memo. 1985-267. The Court of Appeals for the Ninth Circuit formulated the inquiry in such a situation by evaluating the compensation payments from the perspective of a hypothetical independent investor. The prime indicator is the return on its investors' equity. Owensby & Kritikos, Inc. v. Commissioner, supra at 1326-1327. If the company's earnings on equity after payment of the compensation remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. Elliotts, Inc. v. Commissioner, supra at 1247. Petitioner's expert witness on this point, Bruce L. Barren (Barren), is a merchant banker who specializes in valuing businesses, including assessing the reasonableness of compensation paid to executives. Barren testified that during the years in issue, an investor would have been happy with any of the following: a 6 percent dividend return plus 10 percent growth in retained earnings; a 20 percent growth in shareholders' *214 equity; or a capital appreciation factor in excess of 30 percent. He concluded that petitioner exceeded these requirements. In terms of outperforming their competition in gross margin management, Barren concluded that Grosher and Craig were compensated in line with their competitors in the same geographical area. Based on petitioner's performance, Barren would have paid Grosher and Craig more. In his view, any excess moneys earned by a company after achieving a satisfying return should go to the core executive team as compensation. Barren notes in particular that petitioner's gross profit increased by over $ 500,000 from 1987 to 1988, yet Grosher and Craig's compensation increased only $ 2,000 each. Olson also concluded that after payment of Grosher and Craig's compensation, petitioner achieved an above-average return on investment. The Court of Appeals for the Ninth Circuit specifically directs this Court to consider the significance of this data. Elliotts, Inc. v. Commissioner, 716 F.2d at 1247. It seems clear that petitioner's performance during the years in issue would have satisfied an independent investor and, therefore, indicates that *215 Grosher and Craig were not exploiting their relationship with petitioner. Internal Consistency
Finally, evidence of internal inconsistency in petitioner's treatment of payments to employees may indicate that the payments to Grosher and Craig were not reasonable compensation. Elliotts, Inc. v. Commissioner, supra at 1247. Bonuses that have not been awarded under a formal and consistently applied program are suspect, as are bonuses that track the percentage of the employee's stockholdings. Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1991-200. Evidence of a reasonable, long-standing, consistently applied compensation plan is probative that compensation is reasonable. Elliotts, Inc. v. Commissioner, supra at 1247. Petitioner consistently paid bonuses to its employees, including non-owner management, during the years in issue. As a policy matter, petitioner's employees were paid top dollar. Grosher and Craig also were compensated at the high end of petitioner's industry. They considered carefully the *216 input received from their C.P.A. in determining their compensation each year. As set forth in our findings, the compensation paid by petitioner to Grosher and Craig during the 12 years ending with fiscal 1989 (with the exception of one year) as a percentage of gross profits ranged from a low of 34 percent in 1979 to a high of 47 percent in 1985 of net sales. During the years in issue, 1987-89, it was 43, 36, and 36.5 percents respectively. This finding supports a conclusion that Grosher and Craig were compensated pursuant to a plan, albeit informal, that was applied consistently. See Mortex Manufacturing Co., Inc. v. Commissioner, T.C. Memo. 1994-110. Grosher and Craig received equal salaries and bonuses since petitioner's inception and throughout the years in issue. Therefore, payments to them corresponded to their stockholdings in petitioner. We agree with petitioner that the evidence amply demonstrates that Grosher and Craig were equally responsible for the success of petitioner and thus merited equal compensation. The fact that the amounts track their equal ownership is not determinative in these circumstances. Incentive payment plans should *217 be designed to encourage and compensate that extra effort and dedication so valuable to a company. Shareholder employees performing at such a level are no less entitled to benefit from incentive compensation. Elliotts v. Commissioner, 716 F.2d at 1248. The Court of Appeals for the Ninth Circuit has deemed the return on equity an independent investor would have achieved relevant to the consideration of the reasonableness of the compensation formula. Id. at 1248. A formula should reasonably compensate for the work done, the performance achieved, the responsibility assumed, and the experience and dedication of the employee, while at the same time allowing investors a satisfactory return on equity. Elliotts, Inc. v. Commissioner, supra at 1248. Petitioner has established that the amounts paid did not deter from a satisfactory return on equity. We conclude that petitioner has met its burden in proving that the amounts paid to Grosher and Craig reasonably compensated them for the work done, their performance achieved, the responsibility assumed, and their experience and dedication. *218 Id.
We therefore conclude that the compensation paid to Grosher and Craig during the years at issue was reasonable. In view of our holding with respect to the reasonable compensation issue, petitioner is not liable for any additions to tax in any of the years in issue. To reflect the foregoing Decision will be entered for petitioner. Footnotes
1. 50 percent of the interest due on $ 445,862.↩
2. 50 percent of the interest due on $ 284,292.↩