T.C. Memo. 2000-102


UNITED STATES TAX COURT


NORMANDIE METAL FABRICATORS, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2526-98.                          Filed March 27, 2000.


<u>Louis F. Brush</u>, for petitioner.

<u>Halvor N. Adams III</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income tax and a penalty under section 6662 as follows:

|       |            | Penalty   |
| Year  | Deficiency | Sec. 6662 |
| 1993  | $130,822   | $26,164   |
| 1994  | 135,336    | 27,067    |
| 1995  | 120,550    | 24,110    |

In an amendment to answer filed January 7, 1999, respondent contends that petitioner's deficiencies are $163,173 for 1993, $155,139 for 1994, and $141,328 for 1995, and that petitioner is liable for penalties of $32,635 for 1993, $31,028 for 1994, and $28,266 for 1995.[1]

After concessions, the issues for decision are:

1.   Whether petitioner may deduct as compensation for Isidore Klein and Steven Klein for 1993, 1994, and 1995, the amounts shown below as the parties contend, or some other amount:

| Year | Isidore Klein | Steven Klein | Total    |
|------|---------------|--------------|----------|
|      |               | Petitioner   |          |
| 1993 | $352,000      | $500,400     | $852,400 |
| 1994 | 368,000       | 450,400      | 818,400  |
| 1995 | [1]5,000      | 820,400      | 825,400  |
|      |               | Respondent   |          |
| 1993 |               |              | $405,250 |
| 1994 |               |              | 392,157  |
| 1995 |               |              | 444,284  |

[1]   Respondent does not dispute this amount.

We hold that petitioner may deduct $500,000 in 1993, $500,000 in

_____

[1]   Petitioner bears the burden of proving the reasonableness of compensation it paid in excess of what respondent determined was reasonable.  See Rule 142(a).  Respondent bears the burden of proving the increases in deficiency and sec. 6662 penalty asserted in the amended answer.  See id.  However, our decision does not depend on which party bears the burden of proof.

1994, and $445,000 in 1995, based on the following amounts of reasonable compensation:

| Year | Isidore Klein | Steven Klein | Total |
|------|---------------|--------------|-------|
| 1993 | $200,000 | $300,000 | $500,000 |
| 1994 | 200,000 | 300,000 | 500,000 |
| 1995 | 5,000 | 440,000 | 445,000 |

2. Whether petitioner is liable for the accuracy-related penalty under section 6662 for substantial understatement of tax for 1993, 1994, and 1995. We hold that it is for 1993 and 1994, but not for 1995.

Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

## I. FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner is a corporation the principal office of which was in Port Washington, New York, when it filed the petition.

### A. The Kleins

Isidore Klein was born in 1913. He is married to Gertrude Klein. He was a baker and taught baking at a vocational high school in New York. He also manufactured small metal products that he used in his baking business.

Steven Klein was born in 1942. He is the son of Isidore and Gertrude Klein.

### B. Formation of Petitioner

Petitioner manufactures and sells small implements and metal

food handling equipment primarily for the bakery industry. Isidore Klein and Victor Lampeh (Lampeh) incorporated petitioner in 1949 in New York, after Isidore Klein developed white lung disease (similar to emphysema) and had to retire from baking. Isidore Klein initially invested only $119 in petitioner.

Petitioner issued 4 shares of common stock in 1949. In 1954, Lampeh left the company. From March 1954 to January 1995, Isidore Klein owned 3 shares and Gertrude Klein owned 1 share of petitioner's stock. Before and during the years in issue (until January 1995), the members of petitioner's board of directors were Isidore and Gertrude Klein, and Isidore Klein was chairman of the board of directors.

C. Isidore Klein's and Steven Klein's Work for Petitioner Before 1980

1. Isidore Klein

Isidore Klein created, developed, and built petitioner into a profitable business. His background in the baking industry helped him to understand what bakers needed and to develop products to meet those needs. Isidore Klein worked 12 to 18 hours a day, 6 days a week. He manufactured baking implements during the day and often sold his products to bakers at night while they worked.

Petitioner grew during the 1950's because Isidore Klein invented and manufactured several successful products. For example, he invented a hanging cord dispenser, aluminum anodized

cookie display trays in different colors, a line of plastic window display stands, and a motorized carousel tray. Petitioner began producing racks, cabinets, and covers in the 1960's. Isidore Klein continued to invent products in the 1960's and 1970's that petitioner manufactured and sold.

Isidore Klein designed most of the products in petitioner's catalog. He developed many products that became widely accepted in the baking industry in the New York metropolitan area. Baker's Aid, a national seller of baking equipment with annual sales of about $40 million during the years in issue, has been an important customer of petitioner's since the 1950's. Baker's Aid became petitioner's biggest customer largely due to Isidore Klein's innovative products.

2. Steven Klein

Steven Klein worked for petitioner part time and during the summer beginning in the late 1950's when he was in high school. He began working full time for petitioner in September 1963, after he had finished 2 years of college. From 1963 to 1980, he performed most of the jobs in petitioner's business. For example, he worked in the factory, welded, made purchases, and prepared sketches for special orders.

D. Petitioner's Move to Port Washington and the 1984 Guaranty Agreement

On November 1, 1984, petitioner guaranteed a $995,000 industrial development loan to Steven Klein to buy a building in

Port Washington to house petitioner. Petitioner moved from New York to Port Washington in 1984. Petitioner's Port Washington building has an office and a factory. Petitioner rented the building from Steven Klein for 15 years under a triple net lease. Under the 1984 guaranty, petitioner promised not to pay cash dividends or to redeem shares of stock for cash except for stock owned by Isidore Klein. However, the bank waived the covenant and consented to petitioner's redemption of Gertrude Klein's stock for cash in 1995.

E.  Isidore and Steven Klein's Work for Petitioner From 1980 Through the Years in Issue

As discussed next, from 1980 to 1994, Isidore Klein was semiretired, and Steven Klein ran petitioner, subject to Isidore Klein's overall approval.

1.  Isidore Klein

Isidore and Gertrude Klein have lived in Florida since 1980. Isidore Klein had the title of chief executive officer and president of petitioner until he sold his stock in January 1995. Isidore Klein oversaw petitioner's operations in 1993 and 1994. He called Steven Klein at least twice a week in 1993 and 1994 to discuss the business, to monitor the cost of raw materials, labor, and office personnel, and to approve Steven Klein's major business decisions. Steven Klein and Isidore Klein often disagreed about how Steven Klein should run petitioner, which caused a strain in their relationship.

In 1993 and 1994, petitioner's comptroller, Jeffrey Schwaeber, or petitioner's bookkeeper, Karen Macken, sent Isidore Klein weekly financial reports about petitioner. During those years, Isidore Klein called Jeffrey Schwaeber to ask questions about the weekly financial reports. Isidore Klein also corresponded with Richard Schwaeber, petitioner's accountant, in 1993 and 1994 to monitor petitioner's financial position.

Isidore Klein visited petitioner's facility four to eight times a year in 1993 and 1994. He stayed at least a week each time he visited petitioner. In 1993 and 1994, Isidore Klein did not supervise petitioner's salespeople, warehouses, or day-to-day operations. However, Isidore Klein occasionally provided product support to, or consulted on technical or design questions with, Baker's Aid during those years. He also attended trade shows to look for ideas for new products petitioner could manufacture.

In 1993 and 1994, Isidore Klein designed a portable housing system for use by the military or as emergency housing. He attempted unsuccessfully in 1993 and 1994 to market the housing system to the U.S. military. Petitioner did not pursue the portable housing system after 1994.

2. <u>Steven Klein</u>

Steven Klein was petitioner's vice president and chief operating officer from 1991 to 1994. Steven Klein reported to his father during those years. He was responsible for

petitioner's day-to-day management, which he found to be difficult because he was under the constant scrutiny of his father. He managed petitioner's office staff of four people, designed petitioner's marketing catalogues, handled special orders for customers, and designed custom-made items for customers. He managed petitioner's sales activities and was the primary contact for petitioner's biggest customer, Baker's Aid, in 1993, 1994, and 1995. Baker's Aid accounted for about one-third of petitioner's sales in those years. Steven Klein was very familiar with petitioner's customers and operations and had good technical knowledge of its products. In 1993 and 1994, Steven Klein worked long hours. Steven Klein became president and chief executive officer (CEO) in January 1995, when Isidore and Gertrude Klein sold their stock in petitioner. In 1995, Steven Klein assumed more responsibility for petitioner. He often received business telephone calls at home during 1993, 1994, and 1995.

> 3. <u>Petitioner's Redemption of Gertrude and Isidore Klein's Stock and Steven Klein's Purchase of Petitioner</u>

Around 1988, Steven Klein proposed buying Isidore and Gertrude Klein's stock in petitioner because he wanted to control petitioner and to ensure that he and his children would own the business. Steven Klein negotiated intermittently with Isidore Klein from 1988 to 1994 to buy the stock. Isidore Klein initially asked Steven Klein to pay $3 million for the stock.

On January 30, 1995, petitioner redeemed its stock owned by Gertrude Klein for $468,528 and by Isidore Klein for $1,405,584, for a total of $1,874,112.  Petitioner paid Isidore Klein $31,472, and gave him a $1,374,112 note bearing interest at 8 percent for the balance.  Also on that day, petitioner issued 100 shares of its stock to Steven Klein for $1,376.  Since then, Steven Klein has owned all of petitioner's stock.  Petitioner's net worth declined from $2,001,654 in 1994 to $194,130 in 1995 after the redemption.

F.   Petitioner's Employees and Compensation Policies

1.   Petitioner's Employees

Petitioner had three employees during the 1950's:  Isidore Klein and two other people.  By 1963, petitioner had nine employees:  Steven Klein and three others in the office, and five employees in the factory.  By 1993, 1994, and 1995 petitioner had about 13 or 14 employees.

In 1994 and 1995, petitioner had four employees in the office:  Steven Klein, Jeffrey Schwaeber, Karin Paterson (Paterson), and Karen Macken (Macken).  Jeffrey Schwaeber has an accounting degree and worked at his father's accounting firm from June 1981 to September 1991.  His father is Richard Schwaeber, who was petitioner's accountant from 1972 through the years at issue, except for a short time in the late 1970's.  Jeffrey Schwaeber worked for petitioner from 1991 to 1997.  He was

petitioner's vice president for operations, comptroller, and purchasing agent. He set priorities for jobs to be performed in the factory and supervised petitioner's bookkeeper. He signed some of petitioner's quarterly Federal income tax returns and information statements.

Macken was petitioner's bookkeeper from May 1993 through 1995. Paterson worked at petitioner from April 1994 until the end of 1995. Her work included answering phones, taking orders, and printing and mailing invoices.

In 1993, 1994, and 1995, Reinaldo (Ray) Cruz was petitioner's factory foreman, and Felix Ortega received incoming raw material and shipped finished products. Ray Cruz began working for petitioner in 1973, and Felix Ortega in 1985.

2. Compensation Paid by Petitioner

a. Isidore Klein

From 1980 through 1994, Isidore Klein set his own salary based on a percentage of petitioner's gross sales. In 1980, the board of directors (i.e., Isidore and Gertrude Klein) agreed that petitioner would pay Isidore Klein a salary of 8 percent of gross sales but would not reimburse him for his expenses. In 1993 and 1994, Isidore Klein set his salary at 10 percent of petitioner's gross sales. In 1993 and 1994, petitioner paid Isidore Klein $1,000 per week plus $70,000, $80,000, and $80,000, respectively, for the first three quarters, and payments just before yearend of

$70,000 in 1993 and $86,000 in 1994.  Petitioner made these quarterly payments after Richard Schwaeber had prepared petitioner's quarterly financial statements.

Petitioner compensated Isidore Klein from 1986 to 1995 as follows:

| Year | Amount | Percentage of gross sales |
|------|--------|---------------------------|
| 1986 | $226,752 | 8.0% |
| 1987 | 238,298 | 8.0 |
| 1988 | 405,400 | 12.4 |
| 1989 | 426,068 | 12.6 |
| 1990 | 304,100 | 8.3 |
| 1991 | 251,100 | 7.7 |
| 1992 | 367,400 | 10.2 |
| 1993 | 352,000 | 9.9 |
| 1994 | 368,000 | 10.0 |
| 1995 | 5,000 | -- |

b.   Steven Klein

From sometime in the 1980's until January 1995, Steven Klein and Isidore Klein disagreed about how much petitioner would pay Steven Klein, but Isidore Klein ultimately paid Steven Klein what he requested.  Steven Klein set his own pay in 1995.  Petitioner compensated Steven Klein from 1991 to 1995 as follows:

| Year | Amount |
|------|--------|
| 1991 | $393,800 |
| 1992 | 476,800 |
| 1993 | 500,400 |
| 1994 | 450,400 |
| 1995 | 820,400 |

In 1995, petitioner paid Steven Klein:  $7,700 per week, $220,000 on December 26, 1995, and $200,000 on December 28, 1995.

Steven Klein discussed with Richard Schwaeber how much

petitioner could reasonably pay him in 1995.  Richard Schwaeber advised him around the time petitioner redeemed Isidore Klein's stock in January 1995 that, since he was taking on the responsibilities of two jobs (his and Isidore Klein's), a salary of about $800,000 in 1995 would be reasonable.

> c.   Other Employees

Petitioner paid Jeffrey Schwaeber $164,900 in 1992, $173,500 in 1993, $146,900 in 1994, and $148,500 in 1995.  In 1993, 1994, and 1995, petitioner had sales representatives to sell its products.  Petitioner paid its sales representatives commissions of 5 percent.

In 1980, petitioner's board of directors (i.e., Isidore and Gertrude Klein) authorized Isidore Klein to conduct business on its behalf in Florida.  From 1990 to 1996, Howard Appell (Appell) was petitioner's exclusive sales representative in Florida.  In 1993, Appell talked to Jeffrey Schwaeber three to five times a week.  Appell dealt with Steven Klein several times in 1993, 1994, and 1995, but not with Isidore Klein.

G.   Petitioner's Financial History

1.   Petitioner's Sales and Taxable Income

Petitioner's sales increased in nominal dollars from 1983 to 1995.  Petitioner's net income before taxes declined sharply as follows:

| Year | Sales | Net income before officers' compensation and taxes | Net income before taxes |
|------|-------|-----------------------------------------------------|-------------------------|
| 1983 | $2,723,342 | [1] | $279,705 |
| 1984 | 2,911,934 | [1] | 446,738 |
| 1985 | 2,988,876 | [1] | 325,267 |
| 1986 | 2,856,060 | [1] | 303,649 |
| 1987 | 2,982,447 | [1] | 240,456 |
| 1988 | 3,280,793 | $526,466 | 121,066 |
| 1989 | 3,379,488 | 547,980 | 121,912 |
| 1990 | 3,648,605 | 643,168 | 339,068 |
| 1991 | 3,247,094 | 741,359 | 96,459 |
| 1992 | 3,617,493 | 916,256 | 72,056 |
| 1993 | 3,549,669 | 920,277 | 67,877 |
| 1994 | 3,687,715 | 878,621 | 60,221 |
| 1995 | 4,057,464 | 914,715 | 89,315 |

[1] Not in record.

In 1995, $4,057,464 equaled $2,649,524 in 1983 dollars. See Statistical Abstract of the United States 1998, at 487 (chart 771). Thus, petitioner's sales did not increase from 1983 to 1995 in real dollars.

Petitioner's annual and cumulative retained earnings were as follows:

| Year | Annual | Cumulative |
|------|--------|------------|
| 1983 | $157,853 | $677,686 |
| 1984 | 227,686 | 905,372 |
| 1985 | 180,807 | 1,086,179 |
| 1986 | 169,566 | 1,255,745 |
| 1987 | 145,848 | 1,401,593 |
| 1988 | 87,068 | 1,488,661 |
| 1989 | 84,567 | 1,573,227 |
| 1990 | 205,415 | 1,778,642 |
| 1991 | 69,412 | 1,848,054 |
| 1992 | 55,353 | 1,903,407 |
| 1993 | 51,889 | 1,955,296 |
| 1994 | 46,239 | 2,001,535 |
| 1995 | 65,212 | 2,066,747 |

Petitioner has never paid dividends.

Petitioner's return on the fair market value of its operating assets was 0.97 percent in 1993, 0.70 percent in 1994, and 5.26 percent in 1995.

### 2. Petitioner's Federal Income Tax Returns

Richard Schwaeber prepared and signed petitioner's tax returns from 1988 through the years at issue. Petitioner attached Schedules E, Compensation of Officers, to its 1993, 1994, and 1995 returns. However, petitioner did not report the percentage of time that its officers devoted to the business.

### II. OPINION

### A. Positions of the Parties

A taxpayer may deduct payments for compensation if the amount paid is reasonable in amount and for services actually rendered. See sec. 162(a)(1); Rutter v. Commissioner, 853 F.2d 1267, 1270-1271 (5th Cir. 1988), affg. T.C. Memo. 1986-407; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1322-1323 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

Petitioner paid Isidore Klein $352,000 in 1993 and $368,000 in 1994, and paid Steven Klein $500,400 in 1993, $450,400 in 1994, and $820,400 in 1995. Petitioner contends that those amounts were reasonable and were for services they provided to petitioner. Respondent contends that compensation petitioner paid in excess of $405,250 for 1993, $392,157 for 1994, and $451,284 for 1995 was unreasonable, was disguised dividends, and was not for services to petitioner.

B.   Controlling Factors

In Rapco, Inc. v. Commissioner, 85 F.3d 950, 954 (2d Cir. 1996), affg. T.C. Memo. 1995-128, the U.S. Court of Appeals for the Second Circuit, the court to which an appeal in this case would lie, stated five factors to be considered in assessing the reasonableness of an employee's compensation:  (1) The employee's role in the taxpaying company, including the employee's position, hours worked, and duties performed; (2) potential conflicts of interest, such as the ability to "disguise" dividends as salary; (3) the employer's compensation policy for all employees; (4) the character and financial condition of the company; and (5) comparison of the employee's salary with those paid by similar companies for similar services.  No single factor controls. These factors should be examined from the perspective of an independent investor.  See id. at 954-955; Dexsil Corp. v. Commissioner, 147 F.3d 96, 100 (2d Cir. 1998), vacating and remanding T.C. Memo. 1995-135.

Both parties called experts to testify about whether the amount of compensation paid to the Kleins was reasonable. Petitioner's expert was Paul Dorf (Dorf), and respondent's expert was Scott D. Hakala (Hakala).

We next apply the factors listed above in deciding whether the amount of compensation petitioner paid to the Kleins was reasonable.

1.   <u>The Employee's Role in the Company:  The Employee's Position, Hours Worked, and Duties Performed, Plus Any Special Duties or Role</u>

From the perspective of an independent investor, we consider whether the employee's role in the taxpaying company, including the employee's position, hours worked, and duties performed, plus any special duties or role (such as personally guaranteeing corporate loans), justify the compensation paid.  See <u>Rapco, Inc. v. Commissioner</u>, <u>supra</u> at 954.

a.   <u>Isidore Klein's Role</u>

Isidore Klein founded petitioner, built it into a profitable business, and was a prolific inventor.  However, Isidore Klein was less actively involved in petitioner's operations in 1993 and 1994 than he had been in earlier years.  Isidore Klein had no dealings with petitioner's exclusive sales representative in Florida in 1993 and 1994.  Isidore Klein did not manage petitioner day to day after 1980 as he had before he moved to Florida.  Isidore Klein spoke frequently on the phone to Steven Klein and approved the major decisions, but day-to-day responsibility had shifted to Steven Klein.  We think an independent investor would have objected to an increase in Isidore Klein's salary from 8 percent of gross sales in 1992 to 10 percent of gross sales in 1993 and 1994.

Petitioner contends that part of Isidore Klein's compensation in 1993 and 1994 was catchup pay for years in which

he was underpaid. We disagree. Petitioner relies on Dorf's testimony that Isidore Klein's salary in 1993 and 1994 was reasonable because Isidore Klein was somewhat underpaid in earlier years and had no long-term financial incentives and benefits. Dorf's conclusion that Isidore Klein was underpaid in earlier years is unconvincing because he disregarded large bonuses that petitioner paid Isidore Klein in 1984, 1988, and 1989. Dorf's testimony does not establish and there is no evidence that petitioner intended any of Isidore Klein's pay in 1993 and 1994 to be catchup pay. See Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 606 (9th Cir. 1968) (court found that corporate president was not underpaid in part because taxpayer's board did not state that some part of the payments were for his prior services), affg. T.C. Memo. 1967-7; H&A Intl. Jewelry, Ltd. v. Commissioner, T.C. Memo. 1997-467 (pay was not catchup pay where minutes from shareholder meetings showed that the compensation for the current year was not intended to reward the employee's efforts for prior years).

Petitioner points out that Isidore Klein was trying to develop a portable housing system in 1993 and 1994 and contends that it could have increased petitioner's annual revenue from $4 million to $50 million. However, there is no credible evidence that the portable housing system could have generated $50 million of revenue. The fact that Steven Klein abandoned work on the

portable housing system as soon as he became owner of petitioner in 1995 suggests that it did not have the profit potential petitioner now claims.

b.   Steven Klein's Role

Petitioner contends that the amount of compensation it paid to Steven Klein during the years in issue was reasonable because of his superior skills and because he was the driving force behind petitioner and solely responsible for its success in 1995. We disagree in part.

Steven Klein ran petitioner with at best moderate success as evidenced by petitioner's modest increase in the real value of sales, below average performance after officers' compensation (according to Hakala), and sharp decrease in profits from 1983 to 1995. We agree with Hakala that these results would not satisfy an independent investor.

We also disagree that Steven Klein's added duties or longer hours in 1995 merit the large raise in his salary in 1995. We do not believe that an independent investor would have been satisfied with Steven Klein's operation of petitioner in light of Steven Klein's assessment that petitioner was not very valuable and that petitioner might not survive the loss of Isidore Klein in 1995. Richard Schwaeber testified that petitioner had a cash-flow problem and that its net worth essentially "disappeared" when it redeemed Isidore Klein's stock in 1995. We do not

believe that an independent investor would have approved doubling Steven Klein's salary in 1995.

Citing Dexsil Corp. v. Commissioner, 147 F.3d at 102-103, petitioner contends that Steven Klein's salary increase from $450,400 in 1994 to $820,400 in 1995 was reasonable because he was performing his and Isidore Klein's jobs. Petitioner's reliance on Dexsil is misplaced. In Dexsil, the U.S. Court of Appeals for the Second Circuit directed the Tax Court to consider whether compensation paid to a corporate president was reasonable in light of the fact that he performed multiple roles and compared to compensation paid by similar companies for comparable services. See id. at 103. Steven Klein's compensation in 1995 exceeded the total compensation paid to Isidore and Steven Klein in 1994 by $7,000. Steven Klein admitted that he could not perform Isidore Klein's research and development activities as well as Isidore Klein. Steven Klein testified that petitioner would have had to pay someone $150,000-$250,000 to fill the research and development position held by Isidore Klein. Dorf provided market data showing that the annual compensation of a research and development executive was $187,578 for 1993 and $153,712 for 1994. We conclude that an independent investor would not approve paying Steven Klein $150,000 in 1995 for research and development activities that he admitted that he could not perform as well as Isidore Klein.

c.  Petitioner's Other Contentions

Petitioner argues that the compensation paid to Isidore and Steven Klein is justified by the fact that they both guaranteed the 1984 industrial development bond and remained liable on it in 1993 and 1994.  We disagree.  First, Steven Klein, not petitioner, held title to the building purchased with the proceeds of the industrial development bond.  Second, there is nothing about the financing of petitioner's building to justify higher compensation for Steven or Isidore Klein in 1993 and 1994.

Petitioner contends that we should treat it as a personal service company because its success depends on the skill and efforts of its officers, Isidore and Steven Klein, rather than on capital.  Petitioner contends that courts are more deferential in deciding whether payments for services to officers of personal service companies are reasonable, citing C.T.I. Inc. v. Commissioner, T.C. Memo. 1994-82, affd. without published opinion 54 F.3d 767 (3d Cir. 1995); Kay, Inc. v. Commissioner, a Memorandum Opinion of this Court dated Oct. 10, 1949; J. Brodie & Son, Inc. v. Commissioner, a Memorandum Opinion of this Court dated Mar. 30, 1949; and Firefoam Sales Co. v. Commissioner, a Memorandum Opinion of this Court dated Apr. 22, 1947. Petitioner's reliance on these cases is misplaced because petitioner was not a personal service company; it manufactures and sells products.

This factor favors respondent.

2. <u>Potential Conflicts of Interest: Ability To Disguise Dividends as Salary, Particularly If the Employee Is the Sole or Majority Shareholder, or If a Large Percentage of the Compensation Is Paid as a Bonus</u>

The ability to disguise dividends as salary, particularly if the employee is the sole or majority shareholder, or if a large percentage of the compensation is paid as a bonus, may suggest that compensation is not reasonable. See <u>Rapco, Inc. v. Commissioner</u>, 85 F.3d at 954. Payment of bonuses at the end of a tax year when a corporation knows its revenue for the year may enable it to disguise dividends as compensation. See <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1329; <u>Estate of Wallace v. Commissioner</u>, 95 T.C. 525, 555-556 (1990), affd. 965 F.2d 1038 (11th Cir. 1992).

a. <u>Ability To Disguise Dividends Paid to Isidore Klein as Compensation</u>

Isidore Klein set his own salary in 1993 and 1994. Isidore Klein and petitioner did not deal at arm's length in those years because he was the controlling shareholder and chairman of the board of directors. See <u>Estate of Wallace v. Commissioner</u>, <u>supra</u> at 556; cf. <u>Mayson Manufacturing Co. v. Commissioner</u>, 178 F.2d 115, 121 (6th Cir. 1949) (bonus plan established by board of directors for minority shareholders was an arm's-length transaction).

b.  Ability To Disguise Dividends Paid to Steven Klein as Compensation

Petitioner contends that Steven Klein's salary was reasonable in amount in 1993 and 1994 because he had an arm's-length relationship with his father, Isidore Klein, in those years.

We closely scrutinize intrafamily transactions.  See Seven Canal Place Corp. v. Commissioner, 332 F.2d 899, 900 (2d Cir. 1964), remanding T.C. Memo. 1962-307; Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), affd. per curiam 192 F.2d 391 (2d Cir. 1951).  Richard Schwaeber testified that, although Isidore and Steven Klein negotiated Steven Klein's salary, Isidore Klein ultimately paid Steven Klein what Steven wanted.  There is no evidence that Isidore Klein tried to hire someone to replace Steven Klein or to sell petitioner to a third party or that Steven Klein ever sought another job.  Steven Klein's impressive salary in 1993 and 1994 despite petitioner's unimpressive performance suggests that his compensation did not result from arm's-length negotiations and was not handled as an independent investor would have handled it.  These facts suggest that the salary negotiations were not at arm's length.

c.  Yearend Bonuses

The large yearend payments to Isidore and Steven Klein suggest that part of their compensation was disguised dividends.

See Petro-Chem Mktg. Co. v. United States, 221 Ct. Cl. 211, 602 F.2d 959, 968 (1979) (Court inferred that bonuses paid to shareholder-employees near the end of the year which absorbed nearly all of the taxpayer's earnings were at least in part a distribution of profits); Builders Steel Co. v. Commissioner, 197 F.2d 263, 264 (8th Cir. 1952); Owensby & Kritikos, Inc. v. Commissioner, T.C. Memo. 1985-267, affd. 819 F.2d 1315 (5th Cir. 1987); see, e.g., Rich Plan of Northern New England, Inc. v. Commissioner, T.C. Memo. 1978-514. Petitioner paid $230,000 to Isidore Klein in both 1993 and 1994 after the end of the first three quarters, and $70,000 in 1993 and $86,000 in 1994 just before the end of the year. Steven Klein had petitioner pay him $420,000 in the final week of 1995. The yearend payments to Isidore and Steven Klein were made after petitioner's accounting firm had prepared petitioner's quarterly financial statements and computed petitioner's earnings for the first three periods.

The payments to Isidore and Steven Klein left petitioner with a nominal amount of operating profits in 1993 and 1994. Petitioner paid Isidore and Steven Klein 93 percent of its taxable income before officers' compensation in 1993 and 1994, and Steven Klein 90 percent of its taxable income before officers' compensation in 1995. Paying most of petitioner's taxable income as compensation to its officers suggests that its

distributions to Isidore and Steven Klein were in part disguised dividends. See <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1325. We believe Isidore Klein decided the amount of his compensation late in 1993 and 1994, and Steven Klein late in 1995, so that they could receive a greater part of petitioner's net profits as compensation.

Petitioner contends that petitioner did not pay Steven Klein bonuses in 1995; petitioner contends that the amount of the yearend payments to Steven Klein were determined shortly after the redemption of Isidore Klein's stock in consultation with the outside accountants and that petitioner did not pay it until yearend to protect its cash-flow. We disagree. Unlike the payments to Isidore Klein, petitioner did not compensate Steven Klein based on a compensation formula. Steven Klein owned all of petitioner's stock in 1995 and set his own compensation that year. The large yearend payments to Steven Klein in 1995 suggest that part of his payments were disguised dividends.

We believe that an independent investor would not have been satisfied with the large amount petitioner paid to Steven Klein the last week of 1995 since it appears that profits were being "siphoned out of the company disguised as salary." See <u>Dexsil Corp. v. Commissioner</u>, 147 F.3d at 101; <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d 1241, 1247 (9th Cir. 1983), revg. and

remanding on other grounds T.C. Memo. 1980-282; see also <u>Owensby & Kritikos, Inc. v. Commissioner</u>, 819 F.2d at 1327.

This factor favors respondent.

3. <u>Internal Consistency in Compensation: Consistency of the Compensation System Throughout the Company</u>

Inconsistency of the compensation system throughout the ranks of the company may suggest that the employee's compensation is not reasonable. See <u>Rapco, Inc. v. Commissioner</u>, 85 F.3d at 954.

Isidore and Steven Klein paid themselves and Jeffrey Schwaeber generously.

Petitioner contends that it paid all of its employees at or above market rate salaries. We disagree. Petitioner presented no persuasive evidence that it paid all of its employees at or above market rate salaries. On brief, petitioner concedes that it did not have a bonus program during the years in issue. There is no evidence that any of petitioner's employees other than Isidore and Steven Klein shared in the large distribution of profits petitioner made at yearend in 1993, 1994, and 1995. Cf. <u>Home Interiors & Gifts, Inc. v. Commissioner</u>, 73 T.C. 1142, 1159-1160 (1980) (compensation paid to the taxpayer's shareholder-employees was reasonable in part because the taxpayer had longstanding practice of paying all of its key employees on the basis of commissions). This factor favors respondent.

4. <u>Character and Condition of the Company:  Including Sales, Net Income, Capital Value, and General Economic Fitness of the Company</u>

From the perspective of an independent investor, the character and condition of the company, including its sales, net income, capital value, and general economic fitness are important in deciding how much compensation to pay to a corporation's top officers.  See <u>Rapco, Inc. v. Commissioner</u>, <u>supra</u>.  Petitioner contends that the fact that its sales increased from $2,723,342 in 1983 to $3,549,669 in 1993, $3,687,715 in 1994, and $4,057,464 in 1995 shows that its financial condition was good.

We disagree.  Petitioner's retained earnings were lower each year from 1991 to 1995 than they were for any year from 1983 to 1990.  Petitioner's sales did not increase from 1983 to 1995 in real dollars.  Petitioner's net income before taxes declined from $279,705 in 1983 to $67,877 in 1993, $60,220 in 1994, and $89,315 in 1995.  Petitioner's income declined from 1990 to 1994.  Petitioner's sales and income increased from 1994 to 1995, but were still well below the 1983 to 1990 amounts.

We believe petitioner's financial condition in the years in issue would give an independent investor doubts about the performance of petitioner's top management.  See <u>B.B. Rider Corp. v. Commissioner</u>, 725 F.2d 945, 953 (3d Cir. 1984) (taxpayer's deduction for large increases in an employee's salary disallowed

absent evidence that the company's financial condition improved sufficiently to warrant the increases), affg. in part and vacating in part on other grounds T.C. Memo. 1982-98. The instant case is distinguishable from Exacto Spring Corp. v. Commissioner, 196 F.3d 833 (7th Cir. 1999) (compensation of $1.3 and $1.0 million paid to taxpayer's chief executive and principal owner was reasonable; corporation had substantial earnings, sales, and shareholder equity, and CEO's salary was approved by corporation's two other unrelated, 20-percent shareholders), revg. Heitz v. Commissioner, T.C. Memo. 1998-220; Alpha Med., Inc. v. Commissioner, 172 F.3d 942 (6th Cir. 1999) (Court held that compensation of $4,439,180 paid to the president and sole shareholder of a medical management corporation was reasonable because the taxpayer was financially successful), revg. T.C. Memo. 1997-464; Mayson Manufacturing Co. v. Commissioner, 178 F.2d at 120 (larger compensation paid in a particularly successful year was reasonable).

The prime indicator of the return a corporation is earning for its investors is its return on equity. See Owensby & Kritikos, Inc. v. Commissioner, supra at 1324. Petitioner contends that it had an annual return on equity of 23.38 percent and that this return on equity would satisfy an independent investor. Petitioner contends that its return on equity should

be based on Isidore Klein's original $119 investment.

We disagree. First, petitioner cites no case in which a court gave significant weight to a high return on equity computed based on a founding shareholder's small initial investment. Courts have relied on other financial factors when a shareholder's capital contribution is small. See, e.g., Alpha Med., Inc. v. Commissioner, T.C. Memo. 1997-464 (Court derived return on equity by using as shareholder's equity retained earnings for the year at issue plus the shareholder's capital investment, and then comparing the increase in shareholder's equity from prior year to the year at issue), revd. on other grounds 172 F.3d 942 (6th Cir. 1999); Labelgraphics, Inc. v. Commissioner, T.C. Memo. 1998-343 (annual return on equity may be skewed in years in which the taxpayer's equity is low); H&A Intl. Jewelry, Ltd. v. Commissioner, T.C. Memo. 1997-467. Using the approach in Alpha Medical, Inc. v. Commissioner, supra, petitioner's return on equity was 2.7 percent in 1993, 2.4 percent in 1994, and 3.3 percent in 1995.

Second, Hakala testified that it is misleading to measure return on equity based on a shareholder's nominal investment in the company because the shareholder may have invested capital or sweat equity and the company may have contributed patents, intellectual property, or other intangibles that do not appear on

the balance sheet. He testified that the rate of return on equity is best measured by comparing the company's operating return to the fair market value of its operating assets. Petitioner did not respond to Hakala's analysis on this point. Hakala stated that an independent investor would have expected an average net operating return on assets of about 20 percent in the years in issue, and that petitioner's operating returns, which ranged from 0.7 percent to 5.26 percent in the years in issue, were far below the returns that would have satisfied an independent investor. Thus, we give little weight to petitioner's use of Isidore Klein's $119 initial capital contribution to calculate return on equity for 1993, 1994, and 1995.

Petitioner also contends that it did not need to pay dividends because a hypothetical shareholder would be satisfied with the appreciation in value of his or her stock due to petitioner's retention of earnings and the growth in petitioner's annual sales. We disagree. Although Hakala testified that an investor would be happy with a return of $1,874,112 (the redemption price of Isidore and Gertrude Klein's stock) on $119 (Isidore Klein's capital investment), he also stated that it is inappropriate in this case to analyze rate of return based on Isidore Klein's $119 investment.

This factor favors respondent.

5. <u>Comparison With Other Companies:  Salaries Paid to Comparable Employees in Similar Companies</u>

In deciding whether compensation is reasonable, we compare it to compensation paid to persons holding comparable positions in comparable companies.  See <u>Rapco, Inc. v. Commissioner</u>, 85 F.3d at 954; <u>Rutter v. Commissioner</u>, 853 F.2d 1267, 1271 (5th Cir. 1988), affg. T.C. Memo. 1986-407; <u>Mayson Manufacturing Co. v. Commissioner</u>, <u>supra</u> at 119.

Respondent's expert, Hakala, and petitioner's expert, Dorf, submitted reports in which they analyzed compensation paid to persons holding comparable positions in other companies.  Each of their reports provides some basis for us to apply this factor; however, we give less weight to Dorf's opinion because we believe his analysis contains major flaws.

a.   <u>Dorf</u>

Dorf concluded that the compensation petitioner paid to Isidore Klein in 1993 ($352,000) and 1994 ($368,000) and Steven Klein in 1993 ($500,400), 1994 ($450,400), and 1995 ($820,400) "could be deemed reasonable".  We believe he overstated the amount of compensation that "could be deemed reasonable" because he:  (1) Did not consider petitioner's financial performance from the standpoint of an independent investor, (2) incorrectly assumed that Isidore Klein had been undercompensated in prior

years, (3) overstated Isidore Klein's contributions to petitioner in 1993 and 1994, (4) gave too little weight to data from surveys he cited in his report which suggest that Isidore and Steven Klein were overpaid, (5) used as comparables corporations that were more than four times larger than petitioner, (6) analyzed the reasonableness of Steven Klein's compensation based in part on data for which he provided no source and using a method that in effect assumed that Steven Klein's compensation was reasonable, and (7) incorrectly assumed that petitioner's compensation practices were similarly generous to all of petitioner's employees.

The companies which Dorf compared to petitioner had annual revenues averaging $17 million, more than four times those of petitioner. He estimated that Isidore Klein was paid about $66,000 more in 1993 and about $82,000 more in 1994 than the average compensation paid to the CEO's of those companies. Isidore Klein was paid $116,000 to $178,000 more in 1993 and $68,000 to $244,000 more in 1994 than CEO's whose compensation ranked in the third quartile of companies that responded to 1993 and 1994 National Executive Compensation and Panel Publication surveys (i.e., CEO's whose pay ranked from the 50th percentile to the 75th percentile). Despite the data from these surveys, Dorf concluded that Isidore Klein was not overpaid.

Dorf estimated how much it would have been reasonable for petitioner to pay Isidore Klein from 1975 to 1994. Dorf added what he estimated was the compensation of a full-time chief executive officer without Isidore Klein's research and development capabilities ($211,324 in 1993 and $231,538 in 1994), to 50 percent of what he said was the compensation of a full-time research and development professional ($187,578 in 1993 and $153,712 in 1994). He concluded that petitioner overpaid Isidore Klein by $46,887 in 1993 and $59,606 in 1994, but he concluded that Isidore Klein's compensation was reasonable in those years in part because it was catchup pay for prior years. We rejected Dorf's suggestion that Isidore Klein was paid catchup pay at paragraph II-B-1-a, above. Dorf's data suggests that compensation paid to Isidore Klein up to $305,113 in 1993 and $308,394 in 1994 might have been reasonable if he had worked full time. There is no convincing evidence of how much time he worked. We think two-thirds (or somewhat less) time would be a reasonable estimate based on how often he called and visited employees, the fact that he attended some trade shows and worked on the portable housing project, and because he reviewed various records of petitioner's. Dorf's data (which is based on full-time service) suggests that compensation for Isidore Klein of about $200,000 per year for 1993 and 1994 would be reasonable.

We start with Dorf's data for the average CEO (i.e., $211,324 in 1993 and $231,538 in 1994) to decide the reasonableness of Steven Klein's compensation, but we do not increase it based on compensation paid to a person with research and development skills because he lacked Isidore Klein's skills in that area. However, due to Steven Klein's long hours worked, we think Dorf's data suggests the maximum amount of reasonable compensation for Steven Klein would be $300,000 for 1993 and $300,000 for 1994.

### b. Hakala

Hakala testified that the most a similar company would have reasonably paid for the combined services of Isidore and Steven Klein was $405,250 in 1993 and $392,157 in 1994. He also testified that the most a similar company would have reasonably paid Steven Klein in 1995 was $439,284. We believe that he underestimated the total amount Isidore and Steven Klein could reasonably be paid in 1993 and 1994 but that his estimate of Steven Klein's reasonable compensation for 1995 was correct.

Petitioner argues that Hakala relied on companies that were not comparable to petitioner. We disagree. Although Hakala considered Conference Board surveys of larger, public companies, he primarily focused on data from companies that specialized in fabricating metal products and that had annual sales comparable

in size to petitioner's (that is, between $2 and $5 million).

Petitioner contends that Hakala failed to consider that petitioner and the services of Isidore Klein and Steven Klein are unique. Although all companies and corporate officers are in one sense unique, we believe that survey data cited by Hakala (as well as Dorf) is helpful in deciding the amount of Isidore and Steven Klein's reasonable compensation.

Hakala concluded that, from the standpoint of a hypothetical independent investor, the compensation petitioner paid to Isidore and Steven Klein in 1993 and 1994, and to Steven Klein in 1995, was unreasonable. Hakala pointed out that, although petitioner was very profitable before paying officers' compensation, its performance after paying officers' compensation was well below what would satisfy an independent investor. Hakala estimated the maximum amount petitioner could pay Isidore and Steven Klein while paying a reasonable return to an independent investor and concluded that the compensation paid to Isidore and Steven Klein was about twice the maximum reasonable compensation.

Petitioner criticizes Hakala for not separately valuing the services of Steven and Isidore Klein. We agree that having a separate opinion for their reasonable compensation would have been more helpful, but despite that we still find Hakala's analysis to be helpful.

c.   Baker's Aid

Petitioner argues that the best evidence of how much comparable firms pay officers' holding comparable positions was the testimony that the two owners/officers of Baker's Aid (a father and son) each earned $1-$2 million per year in 1993 and 1994.  We disagree because there is no evidence of their duties or accomplishments and because Baker's Aid had annual sales of about $40 million in 1993 and 1994, which is more than 10 times petitioner's sales in those years.

d.   Conclusion

This factor suggests that it would have been reasonable to pay Isidore Klein up to $200,000 in 1993 and $200,000 in 1994 and to pay Steven Klein up to $300,000 in 1993, $300,000 in 1994, and $439,284, or for simplicity, $440,000, in 1995.

C.   Applying the Factors From the Perspective of the Hypothetical Independent Investor

We apply each of these five factors from the standpoint of whether a hypothetical independent investor would approve the compensation petitioner paid to Isidore and Steven Klein in the years in issue.  See Dexsil Corp. v. Commissioner, 147 F.3d at 100; Rapco, Inc. v. Commissioner, 85 F.3d at 954-955; Elliotts, Inc. v. Commissioner, 716 F.2d at 1247.

1.   Isidore Klein

We believe that an independent investor would not have approved the increase in Isidore Klein's longstanding

compensation formula from 8 percent to 10 percent of sales in view of his lessened contribution to petitioner in 1993 and 1994 and petitioner's financial performance compared to earlier years. We conclude that an independent investor would consider compensation paid to Isidore Klein of $200,000 in 1993 and $200,000 in 1994 to be reasonable. These amounts are based in part on Dorf's data. However, they are less than the amounts Dorf said might be reasonable, for reasons stated above where we discussed Dorf's analysis. As discussed at paragraph II-B-3-a, above, we estimate that Isidore Klein worked at most two-thirds of the time in 1993 and 1994. Under the circumstances, we think paying Isidore Klein more than $200,000, which equaled 5 to 6 percent of sales (about two-thirds of his customary 8 percent of sales) was unreasonable.

2.  Steven Klein

We conclude that an independent investor would not have approved Steven Klein's compensation based on petitioner's performance in those years. We do not think an independent investor would believe that Steven Klein should be paid, in 1 year (1995), more than the cumulative amount petitioner earned in the previous 10 years (1986-95). See H&A Intl. Jewelry, Ltd. v. Commissioner, T.C. Memo. 1997-467 (compensation paid to president of corporation was held unreasonable because he was paid more in 1 year than the company earned in the prior 8 years).

We conclude that compensation paid to Steven Klein in excess

of $300,000 in 1993 and $300,000 in 1994 was unreasonable. Due to Steven Klein's assumption of more responsibilities when he became CEO in 1995 and based on Hakala's estimate of reasonable compensation to Steven Klein for 1995, we conclude that compensation up to $440,000 in 1995 was reasonable. These amounts for Steven Klein for 1993 and 1994 are based on Dorf's data but without any additional amounts added for research and development work previously done by Isidore Klein, and with an adjustment for hours worked. Our amount for Steven Klein for 1995 ($440,000) is essentially the same as believed reasonable by Hakala ($439,284). Dorf did not provide data for 1995; Hakala's data is a suitable substitute.

D.  Whether Petitioner Is Liable for the Penalty Under Section 6662 for Substantial Understatement

Respondent determined that petitioner is liable for the accuracy-related penalty for substantial understatement for 1993, 1994, and 1995 under section 6662.

Taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence or substantial understatement of tax. See sec. 6662(a), (b)(1) and (2). A substantial understatement of income tax occurs when the amount of the understatement for a taxable year exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000 in the case of a corporation. See sec. 6662(d)(1)(A).

The accuracy-related penalty does not apply to any part of an underpayment if the taxpayer shows that there was reasonable cause for the underpayment and that the taxpayer acted in good faith.  See sec. 6664(c)(1).  Reliance on the advice of a professional, such as an accountant, may constitute reasonable cause if, under all the facts and circumstances, that reliance is reasonable and the taxpayer acted in good faith.  See sec. 1.6664-4(c), Income Tax Regs.

Petitioner argues that it is not liable for the accuracy-related penalty for the years in issue because the issues in this case are highly technical; petitioner disclosed the deductions on its tax returns for 1993, 1994, and 1995; and Steven Klein reasonably relied on petitioner's accountant to advise petitioner about what would constitute reasonable compensation to pay Steven Klein in 1995.

1.   <u>1993 and 1994</u>

Petitioner is not liable for the substantial understatement penalty if it had a reasonable basis for, and adequately disclosed the facts relating to, the Kleins' compensation on its 1993, 1994, and 1995 returns.  See sec. 6662(d)(2)(B)(ii); Rev. Proc. 94-36, 1994-1 C.B. 682; Rev. Proc. 94-74, 1994-2 C.B. 823; Rev. Proc. 95-55, 1995-2 C.B. 457.  Section 4.01(2)(d) of each of those revenue procedures provides that, for purposes of reducing the understatement of income tax under section 6662(d), additional disclosure of facts relating to an issue involving

reasonable compensation is unnecessary if the taxpayer properly completes Form 1120, Schedule E, Compensation of Officers, including the percent of time each officer devoted to the business. Petitioner did not adequately disclose the facts relating to the Kleins' compensation on its 1993, 1994, and 1995 returns because it left blank the "percent of time devoted to business" section of its 1993, 1994, and 1995 Schedules E.

Petitioner contends that its failure to list the percentage of time petitioner's officers devoted to the business is not significant because the Kleins each devoted a substantial amount of time to the business. We disagree. See C.T.I. Inc. v. Commissioner, T.C. Memo. 1994-82 (taxpayer's disclosure was inadequate because it did not state the percentage of time its officers devoted to the business).

We do not believe that the issues in this case were highly technical. Petitioner does not contend that it relied on its accountant to advise it on the reasonable compensation issue for 1993 and 1994. Thus, we conclude that petitioner is liable for the accuracy-related penalty under section 6662 for 1993 and 1994.

2. 1995

Respondent argues that petitioner did not have reasonable cause for deducting the compensation it paid to Steven Klein in 1995 because it made no attempt to determine whether the amount it deducted as compensation in 1995 was reasonable. We disagree.

Steven Klein relied on Richard Schwaeber to advise petitioner about the amount of compensation it could reasonably pay him in 1995.  Richard Schwaeber told Steven Klein that a salary of about $800,000 in 1995 would be reasonable.  We hold that petitioner's reliance on Richard Schwaeber was reasonable cause for deducting the compensation it paid to Steven Klein in 1995.

We conclude that petitioner is liable for the accuracy-related penalty under section 6662 for 1993 and 1994, but it is not liable for 1995.

To reflect the foregoing and concessions,

<u>Decision will be entered</u>

<u>under Rule 155</u>.